746 So.2d 715 (1999)
D'Ann EAST-GARRETT, Plaintiff-Appellant,
v.
GREYHOUND BUS LINES, Defendant-Appellee.
No. 99-421.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1999.
*717 Jay Pucheu, Marksville, for D'Ann East-Garrett.
Sharon Ryan Rodi, New Orleans, for Greyhound Lines, Inc.
Before THIBODEAUX, PETERS, and GREMILLION, Judges.
PETERS, J.
This workers' compensation case went to trial on the issues of whether the claimant, D'Ann East-Garrett, was entitled to be paid indemnity benefits at a full-time rate; whether the employer, Greyhound Bus Lines, Inc. (Greyhound), properly terminated Ms. East-Garrett's indemnity benefits just over a year after the work accident; and whether Ms. East-Garrett was entitled to penalties and attorney fees. The workers' compensation judge found that Ms. East-Garrett was, in fact, a full-time employee for purposes of calculation of her indemnity benefits. However, the workers' compensation judge also found that Greyhound met its burden of showing that Ms. East-Garrett was offered employment that she was able to perform and that was available to her. Thus, the workers' compensation judge dismissed Ms. East-Garrett's claim. Ms. East-Garrett appeals the workers' compensation judge's failure to award indemnity benefits, penalties, attorney fees, and interest. Greyhound has answered the appeal, seeking reversal of the ruling that Ms. East-Garrett was a full-time employee.

DISCUSSION OF THE RECORD
Ms. East-Garrett was employed by Greyhound in New Orleans, Louisiana, as a driver.[1] On December 16, 1995, she sustained injury to her back while transferring luggage from one bus to another. At the time of the accident, Ms. East-Garrett's hourly wage was $14.86. She has received and continues to receive payment of medical benefits. Additionally, she received indemnity benefits of $330.00 per week through December 24, 1996, at which time the indemnity benefits were terminated.
Prior to the injury at issue in this appeal, Ms. East-Garrett sustained a back injury in December of 1991. She saw Dr. John B. Cazale, IV, a Metairie, Louisiana orthopedic surgeon, in connection therewith and gave a history of injury from *718 pulling up on a driver's seat. A CAT scan revealed a significant bulging disc at L5/ S1. She was treated with medication and physical therapy and was released to work with full activities as of September 12, 1994.
On January 9, 1996, Ms. East-Garrett initially saw Dr. Cazale for the injury at issue in this appeal. At that time, Ms. East-Garrett was complaining of back pain and pain into both legs. Dr. Cazale was of the impression that she had sustained a lumbar strain superimposed on her preexisting lumbar disc problem, and he prescribed medication for her. On March 12, 1996, a repeat CAT scan was performed, and it revealed the same bulging disc at L5/S1 as well as a moderately diffused bulging disc at L4/5, which was causing some narrowing of the canal at L4/5 but with no apparent impingement of the nerve roots. As of July 16, 1996, the doctor was of the opinion that Ms. East-Garrett had reached maximum medical improvement but that she could not perform her previous job. Dr. Cazale assigned Ms. East-Garrett a disability rating of fifteen percent of her whole body. He stated that the only type of work she could perform would be some type of sedentary or light work with restrictions.
In the meantime, Greyhound had a light-duty position available on June 24, 1996, for Ms. East-Garrett as operation support in its office. Ms. East-Garrett testified that she did not accept that position because she was moving to Mansura, Louisiana. Dawn Esposito, a rehabilitation counselor, conducted a labor market survey and, as of September 18, 1996, identified eleven jobs in Greyhound's geographic region as well as five jobs in the Alexandria area, ostensibly within the reasonable geographic region of Mansura. Dr. Cazale approved all of these jobs on October 3, 1996, but Ms. East-Garrett did not obtain employment in any of these jobs.
However, on March 13, 1997, Ms. East-Garrett began working at the Grand Casino Avoyelles as a shuttle bus driver eight hours a day, three days a week. She testified that her duties at that job caused her back pain to increase, and she discontinued her employment at the casino on August 21, 1998.
Ms. East-Garrett testified at the trial of the matter that she is currently taking prescription medications which help her pain but do not eliminate it. Additionally, she indicated that she has not tried other employment because there were no jobs available to her.[2]

OPINION

Full-Time/Part-Time Status
The workers' compensation judge found that Ms. East-Garrett should be considered a full-time employee for purposes of the calculation of her average weekly wage and indemnity benefits. Greyhound contends in its answer to the appeal that the workers' compensation judge was manifestly erroneous in that factual finding.
La.R.S. 23:1021(10)(a) provides in part:
(10) "Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or
(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or *719 more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident; or
(iii) If the employee is paid on an hourly basis and the employee is a part-time employee, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury.
La.R.S. 23:1021(9) defines a part-time employee as one "who as a condition of his hiring knowingly accepts employment that (a) customarily provides for less than forty hours per work week, and (b) that is classified by the employer as a part-time position." Any measure short of informing the employee of her part-time status does not satisfy the notice requirement set forth in La.R.S. 23:1021(9). Scott v. Central Indus., Inc., 602 So.2d 201 (La.App. 3 Cir. 1992). Moreover, La.R.S. 23:1021(10) does not define full-time employment as requiring the employer to guarantee a forty-hour work week. Shortt v. Wal-Mart Stores, Inc., 95-978 (La.App. 3 Cir. 1/31/96); 670 So.2d 369.
Under the Greyhound system, each driver-employee was given a bid sheet and an opportunity to bid on any job/route listed by Greyhound. When applying for the routes, the employee customarily prioritized his or her choices, listing his or her most-desired route first. Ultimately, jobs were awarded based on seniority. Ms. East-Garrett worked for Greyhound as an extra board driver, or a driver who, because of lack of seniority, did not have a regular route. Although Ms. East-Garrett bid on each job listed, as an extra board driver, she did not have a set schedule, a set amount of miles to drive, or set hours but was allowed to choose regular routes in case those routes became available. If there was work available and Ms. East-Garrett's name came up on the list as being next in line for an assignment, she would be sent out and then her name would be put back on the bottom of the list to work back up to a new assignment.
Ms. East-Garrett testified that she knew when she was hired that the extra board driver position might not be a forty-hour-per-week job, but she also testified that she did not apply for a part-time position and that no one informed her that her position would be part-time. Moreover, Ms. East-Garrett testified that each time she applied pursuant to Greyhound's bid procedures, she applied for work that, if given to her, would have provided her forty hours or more of work per week. In fact, she testified that she would bid for every job on the list and that she even inquired about whether there was any way that she could work more hours at Greyhound. However, Ms. East-Garrett acknowledged that there were times that she did not take routes offered to her due to illness in her family. She "guesstimated" that she worked forty hours a week only eight to twelve weeks out of a year. Ms. East-Garrett admitted that she could have chosen routes anywhere in the country if she had wanted to work more time than was available to her in New Orleans, but she would have had to move to another locale.
Although the union contract under which Greyhound was operating defined a part-time employee as "one who works less than 1,200 paid hours per calendar year" (or 23.08 hours per week), importantly, Brian Arthur Mathies, a driver supervisor for Greyhound, testified that all of the drivers working out of the New Orleans terminal are classified as full time and that to his knowledge Ms. East-Garrett was not classified as a part-time driver. However, Mr. Mathies testified that it is Greyhound's policy when it hires extra board drivers to make it clear to them that they will not necessarily work forty hours a week.
The workers' compensation judge found that Ms. East-Garrett was entitled to full-time status because Greyhound did not classify her as a part-time employee. Under *720 the facts of this case, we find no manifest error in that determination.
Additionally, the workers' compensation judge found that the conditions in La.R.S. 23:1021(10)(a)(ii) had not been met in that Greyhound did not offer Ms. East-Garrett forty hours of work per week as an extra board driver such that she was not limited to the calculation of her average weekly wage based on the average of her total earnings per week for the four full weeks preceding the accident. We find no manifest error in that determination. Importantly, although Greyhound did not always offer Ms. East-Garrett forty or more hours a week due to her lack of seniority, she was employed for forty hours or more a week in that she was a full-time worker and was eligible to bid on jobs totaling forty hours or more a week. Moreover, although there were times that Ms. East-Garrett did not take routes offered to her due to illness in her family, the record does not show that she regularly and at her own discretion worked less than forty hours per week. Therefore, we affirm the workers' compensation judge's ruling in that regard.

Indemnity Benefits
Ms. East-Garrett contends that the workers' compensation judge erred in failing to award temporary total disability benefits or, alternatively, full supplemental earnings benefits from the date of termination of benefits, December 24, 1996, to March 13, 1997, the date she began working at the casino.
As of July 16, 1996, Dr. Cazale was of the opinion that Ms. East-Garrett had reached maximum medical improvement and that she could perform full-time sedentary or light-duty work with certain restrictions. Under La.R.S. 23:1221(1)(c), temporary total disability benefits are due if the employee proves by clear and convincing evidence that she is physically unable to engage in any employment, notwithstanding the location or availability of the employment. Therefore, because Dr. Cazale released Ms. East-Garrett to return to sedentary or light-duty work prior to the termination of benefits, she has failed to prove entitlement to temporary total disability benefits for the period from December 24, 1996, to March 13, 1997.
An employee is entitled to receive supplemental earnings benefits if she sustains a work injury that results in her inability to earn ninety percent or more of her average pre-injury wage. La.R.S. 23:1221(3)(a); Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97); 696 So.2d 551. Initially, the employee must prove by a preponderance of the evidence that the injury resulted in her inability to earn that amount under the facts and circumstances of her case. Banks, 696 So.2d 551. Once the employee meets her burden of proof, the burden shifts to the employer, who, in order to defeat the employee's claim for supplemental earnings benefits or establish the employee's earning capacity, must prove by a preponderance of the evidence that the employee is physically able to perform a certain job and that the job was offered to the employee or was available to the employee in her or the employer's community or reasonable geographic region. Id. An employer may discharge its burden of proving job availability by establishing, at a minimum: (1) the existence of a suitable job within the claimant's physical capabilities and within the claimant's or the employer's community or reasonable geographic region, (2) the amount of wages that an employee with the claimant's experience and training can be expected to earn in that job, and (3) an actual position available for that particular job at the time the claimant received notification of the job's existence. Id.
In the instant case, Dr. Cazale was of the opinion that Ms. East-Garrett was not able to perform her prior job, and the parties do not challenge on appeal the workers' compensation judge's implicit finding that Ms. East-Garrett met her initial *721 burden of proving that the injury resulted in her inability to earn ninety percent or more of her average pre-injury wage. Therefore, we will address the issue of whether Greyhound met its burden of proving that Ms. East-Garrett is physically capable of performing a certain job and that the job was offered to her or was available to her in her or Greyhound's community or reasonable geographic region.
Ms. Esposito, a rehabilitation counselor, conducted a labor market survey and identified eleven jobs in the New Orleans area and five jobs in the Alexandria area. The labor market survey is dated September 18, 1996, and Ms. East-Garrett received a list of the jobs on September 27, 1996. Dr. Cazale approved all of the jobs listed in the survey on October 3, 1996. It is not clear whether Dr. Cazale approved the light-duty job Greyhound had available for Ms. East-Garrett on June 24, 1996. The workers' compensation judge found that Greyhound satisfied its burden of proving that jobs were available to Ms. East-Garrett that she was able to perform. Specifically, the workers' compensation judge found that Greyhound's obligation to Ms. East-Garrett ended at the point that a 911 dispatcher position was available to her on a full-time basis with pay of $13.50 per hour.
We note that the labor market survey did not state that a current opening existed but only that the employer for the 911 job was "[c]urrently accepting applications for full-time positions." It is at least unclear as to whether the 911 position was actually available or whether the employer was simply accepting applications for future employment if and when the need arose. In any event, as set forth above, Banks requires the employer to prove in part the existence of a job within the employee's physical capabilities and that an actual position was available for a certain job at the time the claimant received notice of the job's existence. In Banks, among other deficiencies, the employee did not receive notice of the jobs identified until ten days after they were established as being available, and there was no evidence to establish that the jobs were still available when the employee received notice of them. The supreme court found no manifest error in the workers' compensation judge's finding that the employer failed to establish job availability. In the instant case, Ms. East-Garrett did not receive notice of the jobs until nine days after the labor market survey, which jobs were not approved by Dr. Cazale until fifteen days after the labor market survey. She specifically complains on appeal, among other things, that there was no testimony establishing that the jobs were still available when approved by Dr. Cazale some fifteen days later. We have found no proof in the record that these jobs were still available at that time. We find it is implicit in the holding of Banks that the employer must establish that the jobs are still in existence when it is determined that they are within the employee's capabilities. Otherwise, the employee may be put in a position of having to apply for jobs that she might not be capable of performing, essentially a vain and useless act. Because Greyhound failed in its burden of proof in that regard, we find that the workers' compensation judge was clearly wrong in finding that the employer proved job availability. Accordingly, we find that Ms. East-Garrett is entitled to maximum supplemental earnings benefits for the period in question based on a zerobase earning capacity.
We must now calculate the amount of benefits due Ms. East-Garrett. The parties stipulated that Ms. East-Garrett's wages for the four full weeks prior to the accident totaled $1,153.82 and that "[b]ased on [those] figures, D'Ann East-Garrett's average weekly wage was $288.46." However, the stipulation does not appear to require the use of those figures but sets them forth only as the agreed-upon actual amount earned. Additionally, while La.R.S. 23:1021(10)(a)(ii) requires *722 calculation of the average weekly wage based on the average of the total earnings per week for the four full weeks preceding the accident, we found no manifest error in the workers' compensation judge's finding that, although Greyhound hired Ms. East-Garrett as a full-time employee, it did not offer her employment for forty hours or more such that La.R.S. 23:1021(10)(a)(ii) was not applicable to compute the average weekly wage. This is so because, although Greyhound did not always offer Ms. East-Garrett forty hours or more a week due to her lack of seniority, she was employed for forty hours or more a week in that she was eligible to bid on jobs totaling that amount. Rather, we must calculate the average weekly wage pursuant to La.R.S. 23:1021(10)(a)(i), which requires use of Ms. East-Garrett's hourly wage rate multiplied by the greater of the average actual hours worked in the four full weeks preceding the date of the accident or forty hours. Ms. East-Garrett's hourly wage rate multiplied by forty hours yields an average weekly wage of $594.40, and since it is the greater figure, it is the amount to be used in calculating the amount of supplemental earnings benefits due.
Under La.R.S. 23:1221(3)(a), Ms. East-Garrett is entitled to supplemental earnings benefits in the amount of sixty-six and two-thirds percent of the difference between her average monthly wages at the time of the injury and the average monthly wages she is capable of earning after the injury, with the average monthly wage to be computed as four and three-tenths times the average weekly wage. Based on an average weekly wage of $594.40, Ms. East-Garrett's average monthly wage at the time of the injury was $2,555.92 (average weekly wage of $594.40 × 4.3). With a zero-base earning capacity, Ms. East-Garrett's supplemental earnings benefits rate would be $1,703.95 ($2,555.92 × 66 2/3) for the period from December 24, 1996, to March 13, 1997. However, La. R.S. 23:1202(A)(2) provides in part that "[f]or injuries occurring on or after July 1, 1983, the maximum weekly compensation to be paid under this Chapter shall be seventy-five percent of the average weekly wage paid in all employment subject to the Louisiana Employment Security Law.... In no event shall monthly Supplemental Earnings Benefits exceed four and three tenths times temporary total disability benefits." La.R.S. 23:1202(B) provides in part that "[f]or the purposes of this Chapter, the average weekly wage in all employment subject to the Louisiana Employment Security Law shall be determined by the administrator of the Louisiana Employment Security Law on or before August first of each year as of the quarter ending on the immediately preceding March thirty-first of each year." Ms. East-Garrett's benefits are subject to the maximum rate allowed, and we remand this case to the Office of Workers' Compensation for that determination.
Ms. East-Garrett also contends that she was entitled to supplemental earnings benefits for the period of March 13, 1997, through August 21, 1998, the period of her part-time employment as a shuttle bus driver for the casino. She testified that she worked twenty-four hours a week, earning approximately $146.46 a week, and she claims she is entitled to supplemental earnings benefits based on that amount. Ms. Esposito conducted an additional labor market survey dated March 24, 1997, in which she identified four jobs, including a job as shuttle bus driver for the casino, a job as a 911 dispatcher, a job as a medical secretary, and a job as a medical transporter. At least two of these jobs would have provided an income of greater than $146.46 per week, with the 911 position providing at least ninety percent of Ms. East-Garrett's pre-injury wage. However, again, the 911 position simply provided that it was "[a]ccepting applications," not that it had an actual opening. In any event, Ms. East-Garrett did not receive notice of these jobs until April 3, 1997, some ten days after the survey, and Dr. Cazale approved all but the 911 position on *723 April 22, 1997, almost a month after the labor market survey, with Greyhound apparently relying on Dr. Cazale's approval of that position in the prior labor market survey.
With the obvious exception of the shuttle bus position, we have found no proof that these jobs were still in existence at the time Ms. East-Garrett received notice of them or at the time they were approved by Dr. Cazale. Therefore, pursuant to La. R.S. 23:1221(3)(a), Ms. East-Garrett's supplemental earnings benefits must be calculated as sixty-six and two-thirds percent of the difference between her average monthly wages at the time of the injury, i.e., $2,555.92, and the average monthly wages she actually earned during the period in question, i.e., $629.78 ($146.46 × 4.3). Pursuant to those calculations, Ms. East-Garrett is entitled to supplemental earnings benefits in the amount of $1,284.09 ($2,555.92$629.78 = $1,926.14 × 66 2/3 = $1,284.09) for the period from March 13, 1997, through August 21, 1998, subject to the maximum amount allowed by law.
Ms. East-Garrett also contends that the workers' compensation judge erred in failing to award continuing temporary total disability benefits, or alternatively, supplemental earnings benefits from August 21, 1998, the date she ceased her employment with the casino. Although no other jobs were identified for Ms. East-Garrett after that date, there is no evidence that she was unable to engage in any employment after that date. Thus, she is not entitled to temporary total disability benefits for that period. Dr. Cazale had previously approved the shuttle bus position but testified that if an eight-hour day driving the shuttle bus caused an increase in her pain, he would recommend she not drive the shuttle bus for that length of time. He further indicated that if Ms. East-Garrett repeatedly caused an exacerbation in her pain, she could do further damage to her back. Ms. East-Garrett testified that the job caused an increase in her pain and that there were times when she was unable to "handle" the job "very well." Therefore, we find that Ms. East-Garrett is entitled to supplemental earnings benefits from August 21, 1998, which should be based on a zero-base earning capacity, for a supplemental earnings benefits rate of $1,703.95, subject to the maximum amount allowed by law.

Interest, Penalties, and Attorney Fees
Ms. East-Garrett contends that the workers' compensation judge erred in failing to award interest, penalties, and attorney fees. We note that this case involves the discontinuance of payment of benefits rather than the failure to timely commence payment of benefits or the failure to timely pay continued benefits. In Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99); 737 So.2d 41, the supreme court explained that La.R.S. 23:1201.2, as amended by Acts 1995, No. 1137, § 1, effective June 29, 1995, rather than La.R.S. 23:1201, now governs the discontinuance of payment of claims due and arising under the Workers' Compensation Act. La.R.S. 23:1201.2, as amended, provides in part:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims.... The provisions of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.
In other words, as explained by the supreme court in Williams, only attorney fees, and not penalties, are now recoverable under La.R.S. 23:1201.2 if the employer or insurer arbitrarily discontinues payment of benefits due,[3] except that penalties *724 may be assessed against only the insurer under La.R.S. 22:658(C), which is not applicable under the facts of this case.[4] Because this case involves the discontinuance of the payment of benefits, penalties are not available to Ms. East-Garrett for Greyhound's actions in that regard.
Rather, the inquiry is whether Greyhound acted arbitrarily, capriciously, or without probable cause in discontinuing the payment of benefits so as to warrant the imposition of attorney fees. "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." Brown v. Texas-LA Cartage, Inc., 98-1063, pp. 8-9 (La. 12/1/98); 721 So.2d 885, 890. The fact that the employer is subjectively motivated to avoid paying compensation is not determinative of the issue, and neither is the fact that the employer loses a disputed claim. Williams, 737 So.2d 41. "The employer must adequately investigate the claim, and the crucial inquiry is whether the employer had an articulable and objective reason for denying or discontinuing benefits at the time it took that action." Id. at 46.
In the instant case, we assume that Greyhound discontinued benefits based on the labor market survey which identified jobs for Ms. East-Garrett, although Ms. East-Garrett testified that she was told that her benefits were terminated because she was overpaid. In any event, even assuming that Greyhound discontinued benefits based on the labor market survey, we find that it was arbitrary and capricious in failing to pay supplemental earnings benefits, since there was no proof that the jobs were still in existence at the time they were approved by Dr. Cazale. Even so, the only job that would have provided Ms. East-Garrett with ninety percent or more of her pre-injury wages provided only that it was accepting applications and not that it had any actual openings. Thus, reliance on the availability of that job was willful, unreasoning, and without regard for the facts and circumstances. Therefore, we award Ms. East-Garrett attorney fees of $5,000.00.
La.R.S. 23:1201.3(A) provides that "[a]ny compensation awarded and all payments thereof directed to be made by order of the workers' compensation judge shall bear judicial interest from the date compensation was due until the date of satisfaction." See also McLaughlin v. Hill City Oil Co./Jubilee Exxon, 97-577 (La. App. 3 Cir. 10/8/97); 702 So.2d 786, writ denied, 97-2797 (La.2/13/98); 706 So.2d 994. Thus, we award interest on the compensation award from the date due until satisfaction.

DISPOSITION
For the foregoing reasons, we affirm the workers' compensation judge's finding that Ms. East-Garrett was a full-time employee for purposes of calculation of her indemnity benefits. However, we reverse the denial of indemnity benefits and award supplemental earnings benefits in the amount of $1,703.95 for the period from December 24, 1996, to March 13, 1997; in the amount of $1,284.09 for the period from March 13, 1997, through August 21, 1998; and in the amount of $1,703.95 for the period from August 21, 1998, subject to the maximum amount allowed by law. We award attorney fees of $5,000.00. Additionally, we award interest from the due date on the indemnity benefits and from date of judgment *725 on the attorney fees. We remand this case for a determination of the maximum amount of supplemental earnings benefits allowed by law. Finally, we assess costs of this appeal to Greyhound Bus Lines, Inc.
AFFIRMED IN PART; REVERSED IN PART; RENDERED IN PART; AND REMANDED.
NOTES
[1] Although Ms. East-Garrett was employed out of the New Orleans terminal, she had moved to Mansura, Louisiana, by the time of the filing of her workers' compensation claim and, thus, filed her claim in the Alexandria, Louisiana district, of which Mansura is a part. For the convenience of the parties, the workers' compensation judge permitted the parties to proceed in the Alexandria venue.
[2] Ms. East-Garrett did indicate that for a short time she was on a list of substitute teachers to be called when needed, but no specifics were given in this regard.
[3] The supreme court explained that conceivably, an employer who wishes to dispute a claim could pay compensation benefits in bad faith for one or two weeks and then discontinue benefits in an effort to avoid the possibility of penalties. However, there is no indication in the instant case that Greyhound discontinued benefits in bad faith, particularly in light of the fact that it paid weekly indemnity benefits following the accident and did not discontinue those benefits until over a year after the accident.
[4] La.R.S. 22:658(C) provides for penalties for the failure to properly make out a check or draft and for the failure to timely process properly executed and endorsed drafts or checks issued in settlement of a claim.